UNITED STATES of America,
Plaintiff-Appellant,

v.

LE BEOUF BROS. TOWING CO., INC.,
Defendant-Appellee.

UNITED STATES of America,
Plaintiff-Appellant,

v.

T/B CTCO 186–20, her tackle, apparel,
furniture, etc. and T/B CTCO 185,
etc., Defendants-Appellees.

Nos. 74–2849, 74–3140.

United States Court of Appeals,
Fifth Circuit.

Aug. 16, 1976.

Rehearing and Rehearing En Banc
Denied Oct. 12, 1976.

Anthony J. P. Farris, U. S. Atty., Houston, Tex., Gerald J. Gallinghouse, U. S. Atty., Leonard P. Avery, Asst. U. S. Atty., New Orleans, La., Helen M. Eversberg, Jack Shepard, Asst. U. S. Attys., Houston, Tex., Allen Van Emmerik, Admiralty & Shipping Section, Leonard Schaitman, Michael H. Stein, Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Charles E. Lugenbuhl, Donald R. Abaunza, Thomas J. Grace, New Orleans, La., Thomas A. Brown, G. Byron Sims, Houston, Tex., for defendants-appellees.

Lawrence K. Benson, John C. Christian, New Orleans, La., Benson, et al., amicus curiae.

John L. Hantel, New Orleans, La., for Tidewater Marine Service, amicus curiae.

Before TUTTLE and GEE, Circuit Judges.*

GEE, Circuit Judge.

These two cases, which were consolidated on appeal, require us to determine the scope of the statutory immunity entailed when a corporation's agent reports an oil spill to the Coast Guard in the manner required by section 11(b)(4) of the Water Quality Improvement Act of 1970 (WQIA), 33 U.S.C. § 1161(b)(4) (1970), and section 311(b)(5) of its successor statute, the Federal Water Pollution Control Act Amendments of 1972 (FWPCA), 33 U.S.C. § 1321(b)(5) (Supp. 1974).[1] The lower courts in both cases ruled that the statutes confer immunity from any statutorily-imposed penalties that are "criminal in nature." We disagree and reverse in both cases.

Both the 1970 and 1972 statutes[2] require "any person in charge" of a vessel or an onshore or offshore facility to notify the Coast Guard[3] of any oil discharge into the water in quantities determined harmful by the President,[4] provide a criminal penalty for failure to make the required notification, and prohibit use of information reported or derived from that report against the

---

* This case has been decided by a quorum of the court. See 28 U.S.C. § 46.

1. The 1972 amendments took effect several months after the Le Beouf spill but before the T/B CTCO spill.

2. The 1970 statute reads in pertinent part:
   Any person in charge of a vessel or of an onshore facility or an offshore facility shall, as soon as he has knowledge of any discharge of oil from such vessel or facility in violation of paragraph (2) of this subsection, immediately notify the appropriate agency of the United States Government of such discharge. Any such person who fails to notify immediately such agency of such discharge shall, upon conviction, be fined not more than $10,000, or imprisoned for not more than one year, or both. Notification received pursuant to this paragraph or information obtained by the exploitation of such notification shall not be used against any such person in any criminal case, except a prosecution for perjury or for giving a false statement.
   33 U.S.C. § 1161(b)(4) (1970). The wording of the 1972 statute is identical, with two substantive changes not relevant here. See note 4 infra.

3. The statute requires making a report to "the appropriate [federal] agency," which by executive order, Exec.Order No. 11,548, 3 C.F.R. § 539 (1972), is the Coast Guard. See also 33 C.F.R. § 153.100 (1972); 40 C.F.R. § 110.9 (1972).

4. The 1972 amendments authorize the President to select other hazardous substances whose discharge should be prohibited and thus subject to mandatory disclosure. 33 U.S.C. § 1321(b)(5) (Supp.1974).

reporting person "in any criminal case." Both cases here concern oil spills that the lower courts found were properly reported by agents of the appellees under the mandatory disclosure provisions. In *Le Beouf*,[5] the lower court granted summary judgment against the government's suit to recover a $2,500 penalty assessed by the Coast Guard under section 11(b)(5) of the WQIA, 33 U.S.C. § 1161(b)(5) (1970), which imposes strict liability for a penalty, denominated "civil," of up to $10,000 on the owner or operator of any vessel or facility from which oil is knowingly discharged in harmful quantities.[6] In *T/B CTCO*, the lower court dismissed the government's *in rem* action against appellee CTCO's barges for violation of the Rivers and Harbors Appropriations Act of 1899 (Refuse Act), 33 U.S.C. §§ 407 *et seq.* (1970), which prohibits the discharge of refuse into navigable waters, *id.* § 407, makes any violation of the Act by a person or corporation a misdemeanor punishable by a fine or imprisonment, *id.* § 411, and authorizes an *in rem* action for the amount of the fine against any vessel used in the violation, *id.* § 412. Ruling that the statutory immunity provisions—section 11(b)(4) in *Le Beouf*, and its

virtually identical successor, section 311(b)(5) in *T/B CTCO*—should be interpreted to bar imposition of any monetary sanction that is what they deemed "criminal in nature," both courts reasoned that allowing use of evidence derived from a party's compliance with the compulsory reporting requirement would implicate the fifth amendment privilege against self-incrimination and frustrate the purpose of the immunity provision by discouraging disclosure of spills.

▆▆▆▆ Both courts unnecessarily concerned themselves with the nature of the monetary penalties imposed. Such inquiries are necessary only when some constitutional protection is implicated by the imposition of a penalty[7] or the statutory language is ambiguous. In this case, no constitutional right is involved. The fifth amendment privilege against self-incrimination does not extend to corporations.[8] *California Bankers Association v. Shultz*, 416 U.S. 21, 55, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974); *George Campbell Painting Corp. v. Reid*, 392 U.S. 286, 88 S.Ct. 1978, 20 L.Ed.2d 1094 (1968). If appellees were individuals, then we would of necessity examine the nature of the so-called "civil penalties"[9] to deter-

---

5. The opinion is reported at 377 F.Supp. 558 (E.D.La.1974).

6. The statute reads in pertinent part:
   Any owner or operator of any vessel, on-shore facility, or offshore facility from which oil is knowingly discharged in violation of paragraph (2) of this subsection shall be assessed a civil penalty by the Secretary of the department in which the Coast Guard is operating of not more than $10,000 for each offense.
   33 U.S.C. § 1161(b)(5) (1970). The 1972 amendments reduce the maximum fine to $5,000 and eliminate the scienter requirement. 33 U.S.C. § 1321(b)(6) (Supp.1974).

7. Every case cited by the lower courts or by appellees in which the Supreme Court analyzed the civil-criminal nature of a penalty concerns some constitutional right afforded defendants in criminal cases. *See, e. g., Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963) (fifth and sixth amendments); *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (fifth and eighth amendments); *Helvering v. Mitchell*, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938) (fifth amendment); *cf.* Charney, *The Need for Con-*

*stitutional Protections for Defendants in Civil Penalty Cases*, 59 Cornell L.Rev. 478, 491 (1974). *Compare Atlas Roofing Co. v. OSHRC*, 518 F.2d 990 (5th Cir. 1975), *cert. granted on other grounds*, 424 U.S. 964, 96 S.Ct. 1458, 47 L.Ed.2d 731 (1976) (sixth amendment).

8. Appellees concede lack of a self-incrimination violation. While they raise in passing one constitutional objection based on a due-process, fundamental-fairness notion, we reject the suggestion that by fashioning a constitutionally-required immunity provision to protect individuals, Congress thereby "unfairly deprived" corporate entities of a protection they never had.

9. It is necessary to examine the nature of the penalties only when the owner or operator is an individual who is also a "person in charge" required to report the discharge under 33 U.S.C. § 1321(b)(5) (Supp.1974). Obviously, no such need arises under the *in rem* provision of the Refuse Act, since the penalty does not apply *in personam*. Nor does any *constitutional* problem arise if an employee reports a spill that forms the basis of a criminal prosecution against the individual or corporate owner or

mine if the immunity provision as it applied to them required a broad interpretation in order to pass constitutional muster, cf. *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972),[10] or even to decide if the penalties are unconstitutional as applied. But since these corporate defendants cannot claim a pertinent constitutional protection, the issue is purely one of statutory construction, and appellees are foreclosed by the clear statutory wording.[11] The immunity provision, by its terms, extends only to "criminal" cases, while Congress in the very next paragraph expressly labeled the sanction in 33 U.S.C. § 1161(b)(5) about which *Le Beouf* complains a "civil penalty." Only the most compelling demonstration of a contrary legislative intent would persuade us to ignore the plain words of the statute. The wording is unequivocal; by it Congress cannot

operator, since the fifth amendment privilege is personal in nature and cannot be claimed on behalf of a third party, *see California Bankers Ass'n v. Shultz*, 416 U.S. 21, 55, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974); *United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 2167–68, 45 L.Ed.2d 141 (1975), although this circuit has held that the *statutory* immunity would nonetheless apply in a criminal prosecution. *United States v. Mobil Oil Corp.*, 464 F.2d 1124 (5th Cir. 1972) (corporate owner).

10. *But cf. California v. Byers*, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971), and *United States v. Sullivan*, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927), both of which uphold notification requirements in essentially regulatory schemes. One could argue that adoption of a broad interpretation of the grant of immunity to individuals would require a similarly liberal construction of the provision as it applies to corporations since nothing in the statute or legislative history justifies a distinction between the two. *See* Note, 51 Texas L.Rev. 155, 161 (1972). But if we construed the statute more broadly than its plain language, despite the absence of legislative history to support such a construction, it would only be because we presume that Congress does not intend to act unconstitutionally; that presumption need not be indulged when none of the available interpretations infringes on constitutional protections.

11. As well as the normal rule that statutory grants of immunity should be interpreted strictly. *See, e. g., Heike v. United States*, 227 U.S. 131, 33 S.Ct. 226, 57 L.Ed. 450 (1913).

have intended to extend immunity to civil cases, regardless of their "nature." [12] Likewise, forfeiture actions brought *in rem* under the Refuse Act are civil proceedings,[13] *see United States v. T/B NMS*, 330 F.Supp. 781, 782 (S.D.Tex.1971) (Bue, J.); *Shipman v. United States*, 309 F.Supp. 441, 442 (E.D. Va.1970) (citing cases), and thus do not trigger the immunity provision.

■ Appellees suggest that the interpretation which we adopt thwarts the statutory purpose of assuring prompt notification of oil spills. But congressional schemes need not seem to courts symmetrical, consistent, or even effective to be valid. Furthermore, appellees and the lower courts misconceive the multipurpose nature of the statutory scheme. Congress intended both to prevent harmful spills and to minimize the damage caused by such spills.[14] The

12. *Accord, Apex Oil Co. v. United States*, 530 F.2d 1291, 1293 n. 7 (8th Cir. 1976) (criticizing the lower court decision in *Le Beouf*); *United States v. General Motors Corp.*, 403 F.Supp. 1151, 1160–61 (D.Conn.1975).

13. *In rem* forfeiture actions have long been viewed as concerning civil penalties. *See, e. g., The Palmyra*, 25 U.S. (12 Wheat.) 1, 12–13, 6 L.Ed. 531 (1817). *See also Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 683–84, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974) (quoting *The Palmyra*). Since corporations cannot claim a self-incrimination privilege, we need not determine the scope of *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), which held that certain kinds of forfeiture proceedings "are in their nature criminal," *id.* at 634, 6 S.Ct. 524 and thus subject to self-incrimination limitations.

14. See Case Comment, *Compelled Self-Disclosure and Civil Penalties: The Limits of Corporate Immunity in Oil Spill Cases*, 55 B.U.L.Rev. 112, 123 (1975). Congress declared in the first provision of the WQIA that "[t]he purpose of this chapter is to enhance the quality and value of our water resources and to establish a national policy for the prevention, control, and abatement of water pollution," 33 U.S.C. § 1151(a) (1970), and in the FWPCA it declared that "[t]he objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (Supp.1974).

notice/immunity section serves the subsidiary purpose of encouraging prompt notification of spills without infringing the protection against self-incrimination. At the same time, the section imposing civil penalties seeks, at least in part, to transfer cleanup costs to those most culpable.[15] Appellees argue that enforcing civil penalties against those who give notice of spills discourages reporting of smaller, less-noticeable spills that might otherwise go undiscovered. But they forget that the penalty assessment provision furthers the statute's deterrent function and at the same time gives the Coast Guard discretion to reduce the penalty where warranted.[16] The criminal penalties for failure to report a spill should sufficiently encourage corporate employees to report spills, even if their corporate employers thereby incur fines.[17] Thus, the statute has internal consistency, even though its provisions occasionally—and necessarily, in view of the Act's multiple objectives—work at cross purposes. As for T/B CTCO, while the policies underlying the forfeiture provision of the Refuse Act are less clear—since the funds derived from it are not earmarked to cover cleanup expenses—the multipurpose statutory framework of the FWPCA described above suggests that Congress thought removing the threat of criminal prosecution a sufficient inducement for the "person in charge" to report spills. We conclude that it did not intend to extend that immunity to *in rem* forfeiture proceedings.

REVERSED and REMANDED for proceedings not inconsistent with this opinion.

---

15. In 33 U.S.C. § 1161(k), (*l*) (1970) (now codified at 33 U.S.C. § 1321(k), (*l*) (Supp.1974)), Congress established a "revolving fund" into which all fines received under the Act are to be deposited to defray the cost of oil removals. Appellees correctly note that the government can recover cleanup costs under 33 U.S.C. § 1161(f) (1970) (now codified at 33 U.S.C. § 1321(f) (Supp.1974)), but nothing is recovered when the guilty party's identity cannot be determined, so section 11(b)(4)'s automatic penalty imposed on known offenders over and above costs helps defray expenses incurred in removing other discharges caused by unknown sources. *See Hearings on H.R. 15405 Before a Subcomm. of the S. Comm. on Appropriations* (D.O.T. & Related Agencies Appropriations), 93d Cong., 2d Sess. 281, 343-44 (1974) (the self-sustaining nature of the "revolving fund" is being threatened by, *inter alia* to recover costs from unidentified polluters and by the district court decision in *Le Beouf*).

16. Under 33 U.S.C. § 1611(b)(5)(1970) (now codified at 33 U.S.C. § 1321(b)(6) (Supp.1974)),

Any such civil penalty may be compromised by such Secretary. *In determining the amount of the penalty*, or the amount agreed upon in compromise, *the appropriateness of such penalty to* the size of the business of the owner or operator charged, the effect on the owner or operator's ability to continue in business, and the *gravity of the violation, shall be considered by such Secretary.*

(emphasis added). As a matter of policy, the Coast Guard considers the amount of oil discharged in determining the amount of the penalty. *United States v. Le Beouf Bros. Towing Co., Inc.*, 377 F.Supp. 558, 569 (E.D.La.1974) (appendix) (Coast Guard Policy for the Application of Civil Penalties under Section 311(b)(6), F.W.P.C.A.).

17. Appellees point to *United States v. Mobil Oil Corp.*, 464 F.2d 1124 (5th Cir. 1972), as discerning an overriding congressional concern to encourage disclosure. But in *Mobil Oil*, which held that a corporate owner could be a "person in charge" entitled to claim section 11(b)(4)'s statutory immunity from criminal prosecution under the Refuse Act, the court recognized the pressure on a corporate owner faced with possible criminal liability if discovered polluting not to report a spill (in spite of criminal sanctions for nondisclosure), but it was not required to consider the milder chilling effect of imposing a civil fine on an owner confronting possible criminal liability for failure to give notice.